# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

UNITED STATES OF AMERICA,

                          **Plaintiff,**

v.                                      **2:17-cr-20373-TLP**

MARCEL JOHNSON,

                          **Defendant.**

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant Marcel Johnson's Motion to Suppress.  (Docket Entry ("D.E.") #20).  The instant motion was referred to the United States Magistrate Judge for Report and Recommendation.  (D.E. #24).  A hearing was held on the instant motion on June 27, 2018.  For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

## I.      Proposed Findings of Fact

At the hearing on the instant motion, two witnesses testified on behalf of the Government.  Officer Austin Laine ("Officer Laine") of the Memphis Police Department ("MPD") testified that he was on patrol on the night of June 16, 2017 in the Frayser area with his partner, Officer Keith Buchan ("Officer Buchan").  (June 27, 2018 Hearing Transcript ("Tr.") at 19:18-19, 23:18-24:14, 26:15-23).  During his patrol of this "high-crime area,"[1] Officer Laine

---

[1]    Officer Laine described this area as "high-crime" because it has "a lot of burglaries, aggravated assaults, [and] a lot of weapons and drugs recovered."  (Tr. at 24:25-25:2).

made a traffic stop at Point Church and Ardmore on a vehicle that did not have functioning tail lights. (Tr. at 24:15-25:13, 42:11-21, 46:15-48:7, 63:11-64:2). The traffic stop occurred at approximately 3:00 to 4:00 a.m. (Tr. at 48:8-11). According to Officer Laine, the vehicle "didn't have anywhere to pull over" so it "stopped in the lane." (Tr. at 25:14-16, 43:3-44:5). Officer Laine testified that the location where it stopped would have been impeding traffic on this "narrow, two-lane, road that was undivided, without a shoulder." (Tr. at 25:17-26:4). Officer Laine testified that the road had "two or three hills," that the vehicle was parked "on a flat area before the hill goes up," and that the hills would have obstructed the view of the parked car from oncoming traffic. (Tr. at 26:5-14). Officer Laine testified that he had to stand in grass to approach the passenger side of the vehicle. (Tr. at 43:16-19). Officer Laine testified that, at this time of day, there was no traffic on the road. (Tr. at 48:12-49:1). Officer Laine also did not recall any "No Parking" signs on that portion of the road (Tr. at 48:12-49:1); however, Officer Laine testified that he knew that, even if there is not a "No Parking" sign on the street, it is illegal to park blocking traffic. (Tr. at 65:24-66:3).

Officer Laine testified that he and Officer Buchan exited their vehicle and approached the stopped vehicle, with Officer Laine approaching the driver's side and Officer Buchan approaching the passenger side. (Tr. at 27:3-9). Officer Laine asked the driver for his license and identification, and the driver responded that he "didn't have it on him." (Tr. at 27:11-13). Officer Laine then asked the driver for his social security number, which he ran in his system. (Tr. at 27:13-17). Officer Laine determined that the driver was named Steven Smith ("Smith") and that his license was revoked. (Tr. at 27:15-21). Officer Laine testified that, when he advised Smith that his tail lights were not functioning, Smith advised that the vehicle belonged to his

2

girlfriend.  (Tr. at 27:22-28:1).  Officer Laine ran the tags of the vehicle and determined that it was registered under the name of Monique Lewis ("Lewis"), who was not on the scene at the time of the stop.  (Tr. at 28:2-9).

Officer Laine testified that he asked Smith to step out of the vehicle and submit to a pat-down.  (Tr. at 28:10-18).  Officer Laine testified that he also asked Smith if he was a gang member because he noticed "grapes, vine grapes, on his forearm" which indicated to Officer Laine from his previous experience in the gang unit that Smith was possibly a member of the Grape Street Crips.  (Tr. at 28:13-29:9).  Officer Laine was concerned about this affiliation because he had previously worked on a quadruple shooting where two people were killed, and that incident was linked to the Grape Street Crips in South Memphis.  (Tr. at 31:13-23).  Officer Laine patted down Smith but did not find anything of concern on his person.  (Tr. at 29:10-12).

Smith responded to Officer Laine's inquiry about his gang membership by advising that he used to be a member of the Grape Street Crips but was now "inactive."  (Tr. at 29:18-25).  Officer Laine knew from his experience in the gang unit that it is common for active gang members to deny their affiliation.  (Tr. at 66:4-7).  Officer Laine testified that his experience in the gang unit also taught him that "the majority of the gang members are normally armed" and "commit criminal activity."  (Tr. at 52:18-20).  Officer Laine testified that, after inquiring about Smith's gang membership, he placed Smith in the back of the squad car and began to approach the passenger side of the vehicle.  (Tr. at 29:13-17, 31:24-32:2).

While Officer Laine had been working with Smith, he had been able to hear Officer Buchan speaking with the passenger.  (Tr. at 32:18-33:1, 50:21-23).  The passenger had advised Officer Buchan that he did not have his identification.  (Tr. at 33:1).  When Officer Laine joined

Officer Buchan on the passenger side of the vehicle, Officer Laine then had a "short conversation" with the passenger, including inquiring as to whether he was a gang member. (Tr. at 32:3-6). Officer Laine made this inquiry upon noticing a "five-point stars" tattoo on the passenger, which he knew was a symbol of the Vice Lords gang. (Tr. at 32:6-17). The passenger initially denied gang membership but then admitted that he was inactive. (Tr. at 33:2-9).

Officer Laine testified that, after he had this conversation with the passenger, he observed a "purple bandanna sticking up from underneath the passenger seat." (Tr. at 34:3-6, 52:11-14). Officer Laine was aware that purple was the color used by the Grape Street Crips and that members wear that color when they are active. (Tr. at 30:1-9, 34:7-11, 52:15-53:13). Officer Laine then asked the passenger to step out of the vehicle, patted him down for safety, and directed him to the trunk of the vehicle where Officer Buchan was standing. (Tr. at 34:12-16, 53:14-23). As the passenger exited the vehicle, he mentioned having been shot approximately a month and a half to two months prior to the traffic stop. (Tr. at 33:10-13).

Officer Buchan advised Officer Laine that he had identified the passenger as Defendant and that his driver's license was suspended. (Tr. at 34:17-22). Officer Laine testified that he then went to retrieve the purple bandanna, at which time a Sig Sauer .40 caliber pistol "came out with the bandanna." (Tr. at 34:23-35:3, 53:24-54:2). Officer Laine asked Defendant if Smith was a gang member, and he responded that he "didn't know him like that." (Tr. at 35:6-10). Officer Laine testified that he then instructed Officer Buchan to place Defendant in the back of

the squad car so that he could retrieve the handgun and conduct an inventory search of the vehicle.  (Tr. at 35:10-12).[2]

Officer Laine testified that he never provided Defendant his *Miranda* rights at any point during that night because the "Felony Response" team does so.  (Tr. at 56:12-18, 66:9-15). Officer Laine testified that he may have asked Defendant additional questions about his gang affiliation and did ask questions about his criminal history "just to try to get a date on his convictions."  (Tr. at 56:19-25).  Officer Laine testified that he did so to determine if he was a felon in possession of a firearm.  (Tr. at 57:10).

Officer Laine testified that he and Officer Buchan performed the inventory search together and that they did not locate any further contraband or other evidence.  (Tr. at 35:18-22, 37:4-13, 58:58:17-22).  Officer Laine testified that the vehicle was eventually towed after they spoke with Lieutenant Ray.  (Tr. at 35:18-22, 37:4-13).  Officer Laine testified that Officer Buchan completed the tow ticket for the vehicle.  (Tr. at 35:23-36:25 & Exh. 2).  Officer Laine testified that the tow ticket should contain the log of the items recovered from the vehicle.  (Tr. at 57:19-58:2).[3]  Officer Laine testified that he believed it was appropriate to tow the vehicle once

---

[2] On direct examination, Officer Laine testified that he told his partner "to put him in handcuffs" so that he could "retrieve the handgun" (Tr. at 35:10-12); however, on cross examination, Officer Laine testified on one occasion that the passenger was never placed in handcuffs but only patted down (Tr. at 49:21-50:11).  On another occasion, Officer Laine testified that Defendant was placed in handcuffs once the firearm was discovered (Tr. at 56:2-11, 57:11-18).  Officer Buchan also testified that Officer Laine instructed him to place Defendant in handcuffs upon his search around the passenger seat and that he did so.  (Tr. at 71:10-25).  Despite this minor inconsistency that is not dispositive of the issues presented, the Court does not have any concern about Officer Laine or Officer Buchan's credibility.

[3]  On cross examination, Officer Laine was asked why the tow ticket only listed "[k]eys and radio" as "[p]roperty inside the vehicle."  (Tr. at 58:25-59:3).  Officer Laine responded that he did not complete the tow ticket but that the tow ticket only reflects what is "left in the car."  (Tr. at 60:3-4).  Officer Laine was also asked why a cellular phone was not listed on the tow ticket, and he testified that he does not recall how any cellular phones were handled in this particular

he became aware that neither Smith nor Defendant had valid driver's licenses or identification, that the owner of the vehicle was not present, and that the vehicle was not legally parked.  (Tr. at 37:19-38:1, 49:2-20, 54:12-56:1, 60:15-24).  Officer Laine testified that he made the decision to tow the vehicle before he retrieved the purple bandanna.  (Tr. at 53:24-56:1).

Officer Laine further testified that he told Officer Buchan and his lieutenant that one of the reasons that the vehicle had to be towed because he did not want evidence to be suppressed in any proceedings against Defendant for the crime of felon in possession of a firearm; however, Officer Laine asserts that this was not his only reasoning for towing the vehicle.  (Tr. at 60:25-62:4).  Officer Laine also testified that he did not explain the bases for determining that the vehicle should be towed to Smith other than possibly that he did not have a license and that the car was illegally parked.  (Tr. at 62:5-18).  Officer Laine testified that he does not recall Smith ever asking if his vehicle had to be towed but that, if he did, he would have explained that to him.  (Tr. at 64:3-12).  Officer Laine testified that, towards the end of the incident, one of the officers on the scene gave Smith a citation and allowed him to return home.  (Tr. at 64:13-65:5, 76:1-11).  Once the scene was cleared, Defendant was taken in for questioning.  (Tr. at 64:24-25).

Officer Laine testified that, during the traffic stop, his body camera was active.  (Tr. at 38:2-3 & Exh. 3).  Officer Laine testified that the body camera footage accurately reflects where the vehicle stopped on the street.  (Tr. at 39:3-5 & Exh. 3).  Officer Laine further testified that the body camera footage shows the purple bandanna on the floor directly between Defendant's legs.  (Tr. at 39:11-14 & Exh. 3).  Officer Laine testified that his body camera footage would also reflect what, if anything, he told Smith about the reasons for the tow.  (Tr. at 62:5-18).

---

situation but that they are "normally given back to the person" and not listed on the tow tickets because they do not remain inside the vehicle when it is towed.  (Tr. at 58:14-60:9).

Upon the Court's review of Officer Laine's body camera footage, it shows that the vehicle was stopped as Officer Laine described---to the far right of the lane on the edge of the grass.  (Tr. at Exh. 4).  It also shows Officer Laine's discussion with Smith about his gang affiliation, at which time Smith advises he used to be part of the Grape Street Crips but is now unaffiliated.  (*Id.*)  Officer Laine inquires about how Smith was able to leave the gang---specifically whether he just "h[u]ng it up" or had to get "jumped up," to which Smith only responds that he "got out" and "retired."  (*Id.*)  The video footage also shows Officer Laine looking at and asking questions about Smith's grape tattoo, which Smith confirms is a symbol of the Grape Street Crips.  (*Id.*)  Smith also confirms that he has been documented as a Grape Street Crips member.  (*Id.*)

Officer Laine's body camera footage then shows him approach the passenger side of the vehicle, where Defendant is seated.  (*Id.*)  The purple bandanna is clearly visible between Defendant's feet.  (*Id.*)  The body camera footage shows Officer Laine asking Defendant whether he was affiliated with any gang, specifically whether he was a "VL," which Defendant initially denies but then admits that he "used to" be affiliated.  (*Id.*)  Officer Laine asked Defendant whether he just "h[u]ng it up" or had to "fight to get out," to which Defendant replies that he did not have to do "all that."  (*Id.*)  The body camera footage then shows Officer Laine inquiring about whether Defendant had been shot as he exits the car, and Defendant responded that he was shot two months ago in his leg.  (*Id.*)

After Defendant was removed from the vehicle. Patted-down, and taken to the back with Officer Buchan, Officer Laine's body camera footage then shows him retrieve the purple bandanna and ask Defendant whether Smith is "a grape," to which Defendant responds that he

does not know. (*Id.*) Officer Laine directs Officer Buchan to place Defendant in handcuffs. (*Id.*) Officer Laine also inquired about Defendant's last felony charge, which he states was about ten years ago. (*Id.*) Officer Laine walks back to the passenger side door and asks Defendant if it is his pistol underneath his seat. (*Id.*) Officer Laine retrieves the firearm, and the body camera clearly shows that he is standing off the road in leaves while doing so. (*Id.*) The body camera footage shows Officer Laine performing the complete search of the vehicle and returning to the squad car where Defendant is detained and questioning him about whose firearm was in the car. (*Id.*)[4]

Officer Buchan also testified to the events of June 16, 2017. (Tr. at 68:4-6). Officer Buchan testified that he was on patrol "after midnight" in the Old Allen Station of the Frayser area and made a traffic stop with Officer Laine near Point Church and Ardmore on an Infiniti vehicle that did not have functioning tail lights. (Tr. at 68:7-69:1, 78:12-14). Officer Buchan testified that the vehicle pulled over "[a]s best it could on the side of the road," which he described as "very narrow and dark" with no shoulder and hills up ahead that would obstruct the view of the parked car. (Tr. at 69:2-20, 79:1-4, 79:15-80:13). Officer Buchan stated that, although the driver "tried to get it over," if a car were coming eastbound and had to go around it, "due to the hill or the hills on this road, the car coming westbound could have very well caused a head-on collision." (Tr. at 79:22-80:2). Thus, Officer Buchan testified that it was "close enough to the hill that [he] would feel unsafe leaving the car illegally parked where it was." (Tr. at 80:11-13). Officer Buchan testified that, to stand on the passenger side of the vehicle, he had to

---

[4] On cross examination, Officer Laine was asked to authenticate dash camera footage. (Tr. at 44:19-46:9 & Exh. 5). Officer Laine testified that the video footage could be of "any sedan" but that it is "blurry" and he could not tell for certain if it was footage of this particular traffic stop. (*Id.*) Officer Laine testified, however, that the dash camera footage is consistent with what transpired in this traffic stop. (*Id.*)

stand in the grass because it "kind of slopes off right there." (Tr. at 79:5-14). Officer Buchan testified that he did not recall any other traffic on that stretch of the road while they were there. (Tr. at 78:15-25).

Officer Buchan testified that Officer Laine made contact with the driver and that he went up to the passenger side of the vehicle. (Tr. at 69:21-70:1, 76:25-77:2). Officer Buchan testified that he could not see through the passenger window so he asked the passenger to open his door. (Tr. at 69:24-70:1). At that point, Officer Buchan made contact with the passenger, who advised that he did not have any identification, so Officer Buchan requested his social security number, which the passenger provided. (Tr. at 70:1-3, 76:12-25). Officer Buchan testified that the passenger was not combative and complied with his requests. (Tr. at 77:3-5). Officer Buchan identified the passenger as Defendant and determined that he had a suspended license. (Tr. at 70:3-23).

Officer Buchan testified that he remained on the passenger side of the car while Officer Laine checked the driver, got him out of the car, and placed him in the squad car. (Tr. at 70:24-71:1). During this time, Officer Buchan "backed up, went around the car, keeping an eye on the passenger, so [he] could check the driver's area." (Tr. at 71:1-4). He did so to insure there were no weapons or anything else of concern in the immediate reach of the passenger while the passenger remained sitting in the vehicle. (Tr. at 71:5-9). Officer Buchan testified that Officer Laine came to the passenger side of the vehicle, removed Defendant, and "moved him back to the rear of the vehicle" so that he could check the immediate area around the passenger seat for safety. (Tr. at 71:10-17).

Officer Buchan testified that Officer Laine retrieved a purple bandanna and asked Defendant questions about it. (Tr. at 73:9-12). Officer Buchan testified that he had not yet seen the purple bandanna. (Tr. at 82:10-18). Officer Buchan also testified that, as soon as Officer Laine "stood up" from looking into the passenger side of the vehicle, he told Officer Buchan that Defendant needed to be placed in handcuffs. (Tr. at 71:17-18). Officer Buchan testified that he did not know yet why Officer Laine believed Defendant needed to be placed in handcuffs but that he trusted his judgment. (Tr. at 71:18-25). Officer Buchan testified that, once Defendant was placed in handcuffs, he saw Officer Laine "pull[] the gun out." (Tr. at 72:22-73:8). Officer Buchan testified that this was the first time he saw the firearm. (Tr. at 73:2-3). Officer Buchan testified that the decision was made to tow the car "[p]retty much early on, knowing that neither individual that was in the car was going to be able to drive it, it was parked in a terrible position, and it doesn't belong to anybody that was in the vehicle at the time." (Tr. at 73:15-74:3). Officer Buchan testified that he does not recall speaking to Smith at any point, including about the reasons for the tow. (Tr. at 80:14-81:20). Officer Buchan does not recall Officer Laine telling him that the vehicle had to be towed in order to preserve the evidence in this case. (Tr. at 81:21-82:9).

Officer Buchan testified that his body camera was also functioning during this traffic stop. (Tr. at 74:4-75:9 & Exh. 4). Officer Buchan's body camera footage also shows the position of the vehicle on the far right edge of the roadway. (Tr. at Exh. 4). It shows Officer Buchan approaching the Defendant and asking for his social security number. (*Id.*) It also shows Officer Buchan return to the back of the vehicle as Officer Laine is taking Smith out of the vehicle and then checking the driver's side of the vehicle while Defendant remains in the car.

(*Id.*)  It then shows Officer Buchan's perspective on Officer Laine's approach to the passenger side of the vehicle, including him removing Defendant, removing the purple bandanna, removing the firearm, and assisting in the vehicle search.  (*Id.*)

The Government has also introduced several other exhibits in opposition to Defendant's Motion to Suppress.  Exhibit 1 to the hearing on the instant motion contains the MPD Tow-In Policy in effect on June 16, 2017, as certified by Lieutenant Frankie Lanton of the City of Memphis's Department of Accreditation and Research.  (Tr. at Exh. 1, filed at D.E. #28).  With respect to arrests when the suspect's vehicle is not needed for evidence, the MPD Tow-In Policy states as follows:

> When an officer arrests a defendant and the defendant's vehicle is not needed as evidence, the officer is required to allow the defendant to leave the vehicle at the scene of arrest if the defendant so desires and it is legally parked. . . .  The defendant may authorize a third party at the scene who is not under arrest to legally park the vehicle.  The defendant will not be allowed to move his vehicle once he is arrested.  Under no circumstances will an officer on the scene drive the vehicle with or without the owner's consent.  These options must be explained to the defendant before the tow is made.

> If a vehicle cannot be legally parked . . . or released to a third party, then the vehicle should be towed to the City Impound Lot.  <u>A supervisor must be contacted prior to requesting the wrecker</u>.  If the vehicle is left at the scene or released to a third party, a hold harmless agreement must be signed by the defendant.  The signed hold harmless agreement must be signed by the defendant. . . .

(Tr. at Exh. 1, ¶ III) (emphasis in original).

With respect to Obstructing Traffic and Parking Violations, the MPD Tow-In Policy states as follows: "When a vehicle is obstructing traffic and the owner/operator is not available, then the vehicle should be towed to the City Impound Lot."  (Tr. at Exh. 1 ¶ VI).  The Tow-In Policy prescribes the manner of performing an inventory of the vehicle before it is towed.  (*Id.* at

¶ VIII).  With respect to Tow-In Tickets, including what information must be documented about a towed vehicle, the requirements are also set forth in the MPD Tow-In Policy.  (Tr. at Exh. 1 ¶ IV).

Exhibit 2 to the hearing on the instant motion contains the "Memphis Police Department Towed/Recovered Report," referred to at the hearing as the "tow ticket."  (Tr. at Exh. 2; Resp. to Mot. to Suppress at Exh. 1).  It lists "PROPERTY INSIDE THE VEHICLE" as one key and a "TV radio?"  (*Id.*)

Exhibit 5 to the hearing on the instant motion contains dash camera footage that Defendant asserts is of this stop and the subsequent events.  Officer Laine testified that he was unable to authenticate the segment of dash camera footage he was shown at the hearing.  However, the Court also reviewed the dash camera footage, and it is entirely consistent with both Officer Laine and Officer Buchan's body camera footage of the traffic stop.  (Tr. at Exh. 5).  Specifically, it shows a narrow, tree-lined road, a silver car pulling over to the edge of the roadway, the same sequence of events occurring, the same general appearance of the officers, and the same appearance of the driver and passenger, including their clothing and build; however, the footage is indeed blurry and contains no audio.  (Tr. at Exh. 5).

## II.    Proposed Analysis

The Fourth Amendment guarantees that  the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause , supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.   To raise a Fourth Amendment challenge, the court must determine (1)

12

whether the defendant had an actual, subjective expectation of privacy, and (2) whether that expectation was a legitimate, objectively reasonable expectation." *See United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *United States* v. *Pollard*, 215 F.3d 643, 646 (6th Cir. 2000)). The person challenging the search bears the burden of showing a privacy interest in the space in question. *United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988).

When the protections of the Fourth Amendment apply, a warrant is generally required to search a place or seize an item unless an exception to the warrant requirement applies. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002)).

### A. Standing

Defendant first asserts that he has standing to raise his Fourth Amendment claims.[5] However, there is a key distinction between a passenger's standing to challenge a *stop* and standing to challenge a *search*. The Court must begin by considering these two bases for standing.

It is well-settled that a passenger in a vehicle may challenge the constitutionality of a *stop*. *See Brendlin v. California*, 551 U.S. 249, 256-59 (2007). He may do so because he has been subjected to a seizure by virtue of the stop itself, *Id*. at 256-263, and any unlawful seizures are prohibited by the Fourth Amendment, U.S. Const. amend. IV. A passenger challenging the constitutionality of a stop may also challenge whether any evidence obtained from an unlawful stop (and the ensuing detention which necessarily follows) should be suppressed as fruits of

---

[5] This threshold question is referred to as whether Defendant has "standing," although the inquiry is in fact one "within the purview of substantive Fourth Amendment law." *Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978). As courts still use the term "standing" to discuss whether the defendant may make this threshold substantive showing, this Court will do so as well.

illegal activity.  *See United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (citing *United States v. Jones*, 374 F. Supp. 2d 143, 154 (D.D.C. 2005)).

However, a passenger's standing to challenge a *seizure* does not equate to standing to challenge a *search*.  In *Rakas*, the United States Supreme Court considered whether the passenger of a vehicle could raise a Fourth Amendment challenge to the search of a vehicle.  The *Rakas* Court concluded that a passenger who has "neither a property nor a possessory interest in it" does not have a legitimate expectation of privacy in the car, including the area under the seat of the car.  439 U.S. at 148-149.  Relying upon *Rakas* as well as upon the requirement that a defendant demonstrate a property or possessory interest in the vehicle to establish Fourth Amendment standing, the United States Court of Appeals for the Sixth Circuit concluded in *United States v. Martavious Jenkins*, No. 15-6292 (6th Cir. Oct. 11, 2016), that a defendant who was seated in the passenger seat of his girlfriend's vehicle when officer arrived did not have a legitimate expectation of privacy therein and, thus, did not have standing to raise a Fourth Amendment challenge.  (*See* October 11, 2016 Order, filed at D.E. #23-3).[6]

Here, Defendant argues that he has standing to challenge the stop and asserts that "the degree of intrusion transformed the otherwise legal traffic stop into an unconstitutional seizure." (Def.'s Mot. to Suppress at 3).  Accordingly, it is RECOMMENDED that Defendant has standing to raise this challenge to the *stop*, including challenging the fruits obtained from the stop.  The Court will further address the merits of this claim below.

However, to establish standing to challenge the *search*, Defendant must establish a reasonable and legitimate expectation of privacy in the vehicle.  Here, the record is undisputed

---

[6]  Although the *Jenkins* court was not considering a search following a traffic stop, its analysis of whether a defendant had a reasonable and legitimate expectation of privacy as a passenger in his girlfriend's car is nonetheless instructive to the analysis of the facts presented to this Court.

14

that the driver of the vehicle stated that the vehicle belonged to his girlfriend, Lewis; there is no other basis in the record to determine that Defendant had any property interest in the vehicle. The record further contains no indication that Defendant had any possessory interest in the vehicle. In fact, the record is devoid of any connection between the Defendant and the vehicle other than he was riding in it, which is insufficient to establish a passenger's standing to challenge a search of the vehicle. Additionally, the United States Supreme Court has reasoned that a driver with a suspended license who was unable to legally drive the car could not demonstrate any legitimate property or possessory interest in it for purposes of raising a Fourth Amendment challenge to the search thereof. *See Pino*, 855 F.2d at 361. Thus, it is RECOMMENDED that Plaintiff does not have standing to raise a Fourth Amendment claim to the search itself.

### B.   *Constitutionality of the Traffic Stop & Detention*

As it is recommended that Plaintiff has standing to assert that the traffic stop violated the Fourth Amendment, the Court must consider whether the stop was in fact unlawful. "The reasonableness of a traffic stop is measured by the same standards set forth for investigatory stops" in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, *see United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). First, the Court must ask whether there was a proper basis for the stop. *United States v.* Mays, 643 F.3d 537, 541 (6th Cir. 2011). An officer may effect a traffic stop if he possesses "either probable cause of a civil infraction or reasonable suspicion of criminal activity." *Lyons*, 687 F.3d at 763 (6th Cir. 2012) (citing *Gaddis ex rel. Gaddis v. Redford Twp*. 364 F.3d 763, 771 n.6

(6th Cir. 2004)). If the stop was proper, the Court must consider whether the degree of intrusion was reasonably related in scope to the situation at hand. *Mays*, 643 F.3d at 541-42 (citing *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010)).

Here, Defendant does not contest that there was a proper basis for the stop---namely, that the vehicle did not have functioning tail lights. Defendant argues, however, that the degree of intrusion was excessive in relation to the scope of the stop. Specifically, Defendant asserts that the scope of the stop is unreasonable because Smith and Defendant were removed from the vehicle and subjected to *Terry* pat-downs. (Def.'s Mot. to Suppress at 4-6; Tr. at 89:15-22). Further, Defendant argues that the stop was initiated due to non-functioning tail lights but actually became an overly broad and constitutionally impermissible investigation into gang activity. (Tr. at 89:22-90:9).

With respect to the *Terry* pat-downs, both the driver of a vehicle and any passenger may be ordered to step out of the vehicle and may be patted down for weapons if the officer reasonably concludes that the person "might be armed and presently dangerous." *Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111-112 (1977); *Maryland v. Wilson*, 519 U.S. 408, 413-415 (1997)). The justification for this is that traffic stops are "especially fraught with danger to police officers," *Johnson*, 555 U.S. at 320 (citing *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)), and the government's legitimate and weighty interest in officer safety outweighs the *de minimis* additional intrusion of requiring the person, who is already lawfully stopped, to exit the vehicle, *Johnson*, 555 U.S. at 231 (citing *Mimms*, 434 U.S. at 110-111).

Here, Officer Laine approached the vehicle and initially attempted to identify Smith. When Officer Laine determined that Smith had a revoked driver's license, he was instructed to step outside the vehicle, and submit to a pat-down. Officer Laine also informed Smith that he would be receiving a citation. While walking Smith to his squad car, Officer Laine then inquired whether Smith was a member of any gang. Officer Laine suspected that he was a member of the Grape Street Crips, an organization which Officer Laine knew to be involved in violence. Smith admitted that he had been a documented member of the Grape Street Crips but claims he was now unaffiliated; however, Officer Laine testified that he knew from his experience in the gang unit that gang members often deny such involvement. Officer Laine additionally testified that, based upon his experience in the gang unit, gang members are often armed and commit criminal activity. Officer Laine then inquired about Smith's tattoos, and Smith showed him a grape tattoo on the inside of his left forearm that he admitted was a symbol of the Grape Street Crips.

Officer Laine then proceeded to speak to Defendant, who had been allowed to remain in the vehicle. Officer Laine observed the purple bandanna at Defendant's feet, which he believed to be a sign of an active member of the Grape Street Crips, and observed a five-point star tattoo on Defendant's arm that he believed to be a symbol for the Vice Lords gang. At that point, Officer Laine instructed Defendant to exit the vehicle. As Defendant was exiting the vehicle, Officer Laine asked whether he had been shot, and Defendant responded that he had been shot two months prior. Officer Laine testified that this only heightened his concern about Defendant's possible connections to violence. At this point, Defendant was instructed to submit to a pat-down.

17

Based upon Officer Laine's suspicion that Smith and Defendant may be active gang members, based upon Officer Laine's experience in the gang unit that the majority of gang members are armed and commit criminal activity, and based upon Defendant's admission of being recently shot, the Court RECOMMENDS that the pat-down of Defendant was based upon reasonable suspicion that he might be armed and dangerous. Thus, it is RECOMMENDED that the stop and detention of Defendant did not violate the Fourth Amendment. Accordingly, it is RECOMMENDED that the evidence obtained during the stop and detention should not be suppressed as fruits of an unlawful seizure.

### C.  Inventory Search

Finally, even assuming, *arguendo*, that Defendant has standing to raise a Fourth Amendment challenge to the search of the vehicle, it is further RECOMMENDED that the search of the vehicle was constitutionally permissible. "[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). An inventory search should be carried out according to standard police procedures. *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998). In general, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *Bertine*, 479 U.S. at 374.

With respect to compliance with the MPD Tow-In Policy, it is recommended that Officer Laine made the correct determination to tow the vehicle because it was not legally parked while blocking the majority of a lane on a narrow roadway and because there was no third party at the scene who had a valid driver's license that would permit him or her to legally park the vehicle.

Further, Officer Laine contacted his supervisor, as required, to authorize the tow, and a tow ticket was completed for the vehicle.

Although Defendant argues that he was not provided with the "options" before the tow was made, under the MPD Tow-In Policy, there were no options for the persons on the scene to be able to legally park the vehicle. Thus, there were no options to present to Defendant. Defendant further suggests that officers could have left Smith on the roadside to arrange for the vehicle to be moved or they could have driven him to the house where he stayed nearby to attempt to locate Lewis to have her return to move the vehicle. Not only did Officer Laine and Officer Buchan believe that leaving the vehicle parked in that location for any length of time would have created a risk of a head-on collision, none of these actions are required or even contemplated by the MPD Tow-In Policy. Instead, the MPD Tow-In Policy explicitly states that, if the vehicle can neither be legally parked nor released to a third-party on the scene, "the vehicle *should* be towed . . . ." (Tr. at Exh. 1, ¶ III) (emphasis added).

Finally, Defendant asserts that the actual purpose of the search was to investigate gang activity and that the officers only sought to justify the search to avoid suppression of evidence. Yet, as already discussed, it is RECOMMENDED that all of the steps taken were lawful. The fact that they also obtained evidence of gang activity and unlawful gun possession does not render their stop, detention, or search invalid. Further, it is the duty of law enforcement to obtain evidence in accordance with the Constitution for the purpose of its presentation in any subsequent judicial proceeding. An officer's desire to insure that evidence be admissible is not the appropriate inquiry for determining if suppression is warranted; instead, the inquiry is whether the mandates of the Fourth Amendment were met in performing the search. Here, it is

RECOMMENDED that the search of the vehicle was a valid inventory search that comported with the requirements of the Fourth Amendment.   Accordingly, it is RECOMMENDED that, even if the District Court were to determine that Defendant has standing to challenge the search, the search was nonetheless lawful under the inventory exception to the warrant requirement.

### D.  Miranda

Finally, Defendant asserts that he was subjected to custodial interrogation without *Miranda* warnings when Officer Laine and Officer Buchan questioned him.  Specifically, Officer Laine asked the following questions:  (1) his name; (2) what gang he is in; (3) whether he is a "VL,"; (4) whether he used to be a "VL"; (5) when he got out of the gang; (6) whether he just "h[u]ng it up" or had to "fight to get out"; (7) whether he had anything on his person in advance of being patted down; (8) whether he had been shot; (9) when he had been shot; (10) where he was at when he was shot; (11) what street he lives on; (12) whether Smith was "a grape"; (13) whether he had previously been incarcerated; (14) on what charges has he been incarcerated; (15) when was his last felony charge; (16) whether it was his pistol under the seat; (17) whose pistol was under the seat; and, (18) whether the pistol would have his fingerprints on it.  (Tr. at Exh. 3).  Additionally, Officer Buchan asked Defendant as follows: (1) whether he had anything on his person before being placed in handcuffs; (2) why he had been shot; and, (3) whether he had been "into it" with anyone when he was shot.  (Tr. at Exh. 4).

The Government advised the Court at the hearing on the instant motion that it did not intend to use any of Defendant's statements "with relation to him being a felon or anything like that"; however, the Government stated that "the questions about his gang membership could be

relevant" for the instant motion, "specifically as to why the pat downs occurred and, probably, res gestae evidence at trial." (Tr. at 9:21-11:11).

The Fifth Amendment to the United States Constitution prohibits an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under *Miranda v. Arizona*, an individual that is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning" must be provided information on the following "[p]rocedural safeguards" to protect his privilege against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *see also Duckworth v. Eagan*, 492 U.S. 195, 201 (1989). The "failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule." *United States v. Pantane*, 542 U.S. 630, 641 (2004). "[V]iolations occur, if at all, only upon the admission of unwarned statements into evidence at trial"; thus, "the exclusion of unwarned statements . . . is a complete and sufficient remedy for any perceived *Miranda* violation." *Id*. at 641-42 (citations omitted).

Here, Defendant was initially questioned while being detained in the vehicle during the traffic stop. The United States Supreme Court has held that "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). Instead, "[i]t is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed 'to a degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440 (quoting *California v. Beheler*, 463 U.S. 1121,

1125 (1983) (per curiam)) (emphasis added).  "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."  *Berkemer*, 468 U.S. at 439. Accordingly, it is RECOMMENDED that Officer Laine's questioning while Defendant was seated in the car, while he was exiting the vehicle, while he was being patted down, and while he was standing at the back of the vehicle before being placed in handcuffs did not require *Miranda* warnings.

After being placed in handcuffs, Defendant was further questioned without any provision of *Miranda* warnings.  First, Defendant was asked whether the gun belonged to Smith, but this questioning did not call for any self-incriminating response.   Accordingly, the Court RECOMMENDS that asking this question before providing *Miranda* warnings was not improper.

Next, Defendant was asked about his prior criminal history, including whether he had previously been incarcerated, on what charges he had previously been incarcerated, and when he last obtained a felony conviction.  Defendant admitted to being a felon, stating that his last felony was approximately ten years prior.  Officer Laine testified that this questioning was to determine whether Defendant was a felon in possession of a firearm.  Upon review, the Government has stated that it does not intend to use this statement for any purpose in this case.  Accordingly, it is RECOMMENDED that the District Court need not reach the question of whether these statements should be suppressed.

Defendant was also asked whether the firearm Officer Laine found in the vehicle was his, whether the firearm would have his fingerprints on it, why he had previously been shot, and

22

whether he was "into it" with anyone when he was shot.  Defendant denied that it was his firearm under the seat and denied that he had touched it.[7]  The Government did not indicate that it wished to utilize these statements at trial but also did not explicitly assert that it did not wish to do so.

In *United States v. Ashmore*, 609 Fed. Appx. 306, 319 (6th Cir. 2015), the United States Court of Appeals for the Sixth Circuit considered whether asking "one compound question relevant to a felon-in-possession charge," namely "is there a gun in the car and are your fingerprints on it?," was improper when the defendant had not yet been provided his *Miranda* rights.  The *Ashmore* court stated that these "pre-*Miranda* statements were obtained through 'coercion or improper tactics'" when the officer "knew there *could* be a firearm in the car and attempted to elicit an admission from [the defendant] that he possessed the firearm prior to *Miranda* warnings by getting him to admit that his prints would be on the gun."  *Id*. at 319 (quoting *Oregon v. Elstad*, 470 U.S. 298, 308 (1985)) (emphasis in original).  The *Ashmore* court further noted that the questioning regarding the firearm was particularly unnecessary when the defendant was handcuffed and, thus, "there was no public safety rationale for the pre-*Miranda* interrogation."  *Id*. at 318 (citations omitted).  However, here, Defendant provided no incriminating responses to these inquiries.  Thus, although the Court RECOMMENDS that the questioning without *Miranda* warnings was improper, the Court further RECOMMENDS that there are no potentially violative statements that the Government may admit or that could warrant suppression.

---

[7]   Defendant's response to whether his fingerprints would be found on the firearm is inaudible. (Tr. at Exh. 3).

### III.    Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

**DATED** this 12th day of September, 2018.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**